# ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 16-1021 (and consolidated case No. 13-1256)

SIERRA CLUB, *et al.*,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*.

Petition for Review of Final Administrative Actions of the
United States Environmental Protection Agency

## FINAL REPLY BRIEF OF PETITIONERS

James S. Pew
Neil Gormley
Earthjustice
1625 Massachusetts Ave., N.W.
Suite 702
Washington, D.C. 20036-2212
(202) 667-4500
jpew@earthjustice.org
ngormley@earthjustice.org

*Counsel for Louisiana Environmental Action Network, Sierra Club, Clean Air Council, Partnership for Policy Integrity, and Environmental Integrity Project*

Patton Dycus
Eric Schaeffer
Environmental Integrity Project
1000 Vermont Ave., N.W.
Suite 1100
Washington, D.C. 20005
(202) 296-8800
pdycus@environmentalintegrity.org
eschaeffer@environmentalintegrity.org

*Counsel for Environmental Integrity Project and Chesapeake Climate Action Network*

**DATED:     February 6, 2017**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... iii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................ vi

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ...................................................................................... 2

I.   EPA'S WEAKENED CARBON MONOXIDE STANDARDS ARE
UNLAWFUL AND ARBITRARY. ........................................................ 2

   A. EPA's Weakened Carbon Monoxide Standards Contravene
§ 7412(d)(3), And Are Arbitrary. ........................................... 2

      1.  EPA's Weakened Carbon Monoxide Standards Are Less Stringent
Than § 7412(d)(3) Requires. ............................................ 2

      2.  EPA Cannot Excuse Itself From Compliance With § 7412(d)(3). ....3

      3.  *U.S. Sugar* Does Not Support EPA's Floors. ................................. 6

      4.  EPA's Lawyers' Argument That EPA's Weakened Floors Require
The Maximum Achievable Reductions Is *Post Hoc* And Without
Merit. ........................................................................... 8

   B. EPA's Weakened Carbon Monoxide Standards Do Not Require
The Maximum Achievable Reductions In Either Carbon
Monoxide Or Organic Hazardous Air Pollutants. ............................... 10

      1.  EPA Never Claimed That Its Standards Require The Maximum
Achievable Reductions. .................................................. 10

      2.  EPA's Lawyers' Claim That EPA's Weakened Carbon Monoxide
Standards Require The Maximum Achievable Reductions In
Organic HAPs Is *Post Hoc* And Without Merit. ........................... 10

II.  EPA'S WORK PRACTICE STANDARDS FOR STARTUP AND
SHUTDOWN ARE UNLAWFUL AND ARBITRARY. ........................ 14

   A. EPA Did Not Satisfy § 7412(h)'s Requirements For Setting
Work Practice Standards In Lieu Of Numeric Emission
Standards. .................................................................... 14

      1.  By Setting Work Practice Standards Without Determining That
Emissions Measurement Is Impracticable For Any Particular Class
Of Sources, EPA Violated The Clean Air Act. ......................... 14

   2. EPA's Decision To Set Work Practice Standards For The Extended Startup Period Is Arbitrary And Capricious. ....................................18

B. EPA's Work Practice Standard For The Extended Startup Period Is Inconsistent With § 7412(d) And Arbitrary. .....................................20

   1. EPA's Work Practice Standard Is Not "Consistent With" § 7412(d). ..............................................................................20

   2. EPA's Desire To Accommodate "Each Possible Combination" Of Boiler, Fuel, And Control Equipment Does Not Excuse The Unlawfulness Of Its Work Practice Standard. .................................25

   3. EPA's Refusal To Require Boilers To Use Clean Fuels During Startup Is Unlawful And Arbitrary. .................................................26

C. EPA's Work Practice Standard For Shutdown Is Unlawful And Arbitrary. ..................................................................................28

   1. EPA's Misrepresentation Of Its Rule Is Arbitrary. ........................28

   2. EPA's Work Practice Standard For Shutdown Is Inconsistent With § 7412(d) And Arbitrary....................................................28

CONCLUSION ..........................................................................30

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*Allentown Mack Sales & Service v. NLRB*,
    522 U.S. 359 (1998)................................................................28

*Association of Battery Recyclers v. EPA*,
    716 F.3d 667 (D.C. Cir. 2013)..............................................28

*Cement Kiln Recycling Coalition v. EPA*,
    255 F.3d 855 (D.C. Cir. 2001)........................................3, 8, 9

*Engine Manufacturers Association v. EPA*,
    88 F.3d 1075 (D.C. Cir. 1996)..................................................4

*EPA v. EME Homer City Generation*,
    134 S. Ct. 1584 (2014)..............................................................5

*Florida Power & Light Co. v. FERC*,
    85 F.3d 684 (D.C. Cir. 1996)..................................................13

*Lamie v. United States Trustee*,
    540 U.S. 526 (2004)..........................................................3, 10

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)................................................................20

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015)............................................................17

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile
    Insurance Company*,
    463 U.S. 29 (1983).....................................9, 11-13, 19, 24, 26, 28, 30

*National Association of Clean Water Agencies v. EPA*,
    734 F.3d 1115 (D.C. Cir. 2013)..............................................9

*National Association of Manufacturers v. DOL*,
    159 F.3d 597 (D.C. Cir. 1998)..................................................4

\* Authorities upon which we chiefly rely are marked with an asterisk

iii

*New Jersey v. EPA*,
    517 F.3d 574 (D.C. Cir. 2008)...........................................................................4, 5

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008)...........................................................................17

*Pavelic & LeFlore v. Marvel Entertainment Group*,
    490 U.S. 120 (1989)............................................................................................5

*SEC v. Chenery*,
    318 U.S. 80 (1943)............................................................................................19

\* *Sierra Club v. EPA*,
    479 F.3d 875 (D.C. Cir. 2007)....................................................................3, 8, 9

\* *Sierra Club v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008)..................................................................21, 29

*Southern California Edison Co. v. FERC*,
    603 F.3d 996 (D.C. Cir. 2010)..........................................................................19

*United States v. Hines*,
    694 F.3d 112 (D.C. Cir. 2012)............................................................................4

*United States v. Menasche*,
    348 U.S. 528 (1955)............................................................................................9

\* *United States Sugar Corporation v. EPA*,
    830 F.3d 579 (D.C. Cir. 2016)........................................... 5-8, 11, 22

*Utility Air Regulatory Group v. EPA*,
    134 S. Ct. 2427 (2014)......................................................................................26

*Village of Barrington, Illinois v. Surface Transportation Board*,
    636 F.3d 650 (D.C. Cir. 2011)..........................................................................26

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001)..........................................................................................17

**STATUTES**

*42 U.S.C. § 7412(d)(2)...........................................................4, 10, 20, 22, 24

*42 U.S.C. § 7412(d)(3)........................................................................4

*42 U.S.C. § 7412(h)(1)..............................................................16, 20

*42 U.S.C. § 7412(h)(2)..............................................................16, 17

42 U.S.C. § 7412(h)(4)....................................................................18

**REGULATIONS**

40 C.F.R. § 63.7575 ........................................................................30

**FEDERAL REGISTER NOTICES**

75 Fed. Reg. 32,006 (June 4, 2010) ....................................................8, 11

76 Fed. Reg. 15,608 (Mar. 21, 2011)..............................................8, 11, 14

76 Fed. Reg. 80,598 (Dec. 23, 2011)....................................................22

78 Fed. Reg. 7138 (Jan. 31, 2013)............................................6, 11, 12, 27

80 Fed. Reg. 72,790 (Nov. 20, 2015) ........................... 15, 16, 20, 23, 27-30

## <u>GLOSSARY OF ACRONYMS AND ABBREVIATIONS</u>

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| CO | Carbon monoxide |
| HAP | Hazardous Air Pollutant |
| PAH | Polycyclic aromatic hydrocarbon |
| ppm | Parts per million |
| POM | Polycyclic organic matter |
| µg/dscm | Micrograms/dry standard cubic meter |
| ng/dscm | Nanograms/dry standard cubic meter |

## SUMMARY OF ARGUMENT

**Carbon Monoxide Standards.** EPA's brief confirms that the challenged carbon monoxide standards do not, in any sense, reflect the emission levels achieved by the best performing boilers. EPA does not have to set carbon monoxide standards but, if it does, those standards must comply with the statute's stringency requirements. If EPA believes that setting compliant standards is futile, the agency can meet its obligation to regulate organic hazardous air pollutants by using a different surrogate or setting direct standards for them.

EPA's brief also confirms that its standards do not require the maximum degree of reduction that is achievable in emissions of carbon monoxide or organic hazardous air pollutants. EPA's lawyers claim they do, but the record lends no support to their *post hoc* assertions.

**Work Practice Standards.** EPA does not claim that it is impracticable for either all boilers or any particular class of boilers to measure emissions during the four hours after they first supply useful energy. Further, EPA concedes that some boilers can do so. Because EPA did not show that setting numeric standards is infeasible, it violated the statute and acted arbitrarily by setting work practice standards instead.

For all pollutants except particulate matter, the only work practice required during the extended four-hour startup period is to engage controls "as

1

expeditiously as possible." EPA's brief does not explain how this requirement is any different than a general duty requirement. This Court has found such requirements to be inconsistent with the statute, and EPA agrees. Moreover, EPA has not shown that this lone work practice requires the maximum achievable reductions, as EPA agrees it must. In particular, EPA's rule does not require the use of clean fuels during startup, despite EPA's belief that it does and EPA's recognition that the use of clean fuels is achievable and would reduce emissions.

Finally, EPA does not deny that its claim to have required the use of clean fuels during shutdown was false. EPA's misrepresentation of its own regulations is arbitrary and, without a clean fuel requirement, EPA's rule unlawfully exempts some boilers from any obligation to control their emissions during shutdown.

## ARGUMENT

## I.   EPA'S WEAKENED CARBON MONOXIDE STANDARDS ARE UNLAWFUL AND ARBITRARY.

### A.   EPA's Weakened Carbon Monoxide Standards Contravene § 7412(d)(3), And Are Arbitrary.

#### 1.   EPA's Weakened Carbon Monoxide Standards Are Less Stringent Than § 7412(d)(3) Requires.

EPA does not dispute that the 13 carbon monoxide ("CO") standards it weakened to 130 parts per million ("ppm") are less stringent than the carbon monoxide emission levels achieved by the relevant best controlled boilers. *See* Br.

2

at 26-28. Nor does EPA dispute that § 7412(d)(3) requires floors for carbon monoxide to reflect the emission levels actually achieved by the sources that are best performing with respect to carbon monoxide. *See id.*

By confirming that EPA's floors do not even purport to reflect the emission levels achieved by the best performing sources, EPA's brief confirms they are unlawful. This Court has held repeatedly that floors under § 7412(d)(3) must reflect "the emission level actually *achieved* by the best performers (those with the lowest emission levels)." *Sierra Club v. EPA*, 479 F.3d 875, 880 (D.C. Cir. 2007) (citing *Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 861 (D.C. Cir. 2001)); Br. at 26-27; *see Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts … is to enforce it according to its terms.'").

## 2.    EPA Cannot Excuse Itself From Compliance With § 7412(d)(3).

Contrary to EPA's assumption (at 18-19), its carbon monoxide standards are not excused from the requirements of § 7412(d)(3) just because carbon monoxide is a surrogate for hazardous air pollutants ("HAPs") rather than a hazardous air pollutant itself. The stringency requirements in Clean Air Act § 7412(d)(3) apply unambiguously and without exception to "[e]mission standards promulgated under

this subsection." 42 U.S.C. § 7412(d)(2)-(3).[1] EPA's carbon monoxide standards are "[e]mission standards promulgated under" § 7412(d). *Id.* Thus, like all standards promulgated under § 7412(d), these standards must satisfy the stringency requirements in § 7412(d)(3). "[F]or [ ] EPA to avoid a literal interpretation at *Chevron* step one, it must show either that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it." *New Jersey v. EPA*, 517 F.3d 574, 582 (D.C. Cir. 2008) (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996)). EPA has not done so in the record or in its brief.

Nor does it help EPA to argue that reducing CO emissions below 130 ppm would not yield further reductions in organic hazardous air pollutants. EPA Br. at 18-19. The statute's requirement that standards promulgated under § 7412(d) satisfy the stringency requirements in § 7412(d)(3) is unambiguous. It provides no exceptions for situations where EPA is regulating hazardous air pollutants through a surrogate and does not believe that setting § 7412-compliant standards for that surrogate would be efficacious. *See Nat'l Ass'n of Mfrs. v. DOL*, 159 F.3d 597, 600 (D.C. Cir. 1998) ("There is, of course, no such 'except' clause in the statute, and

---

[1] The term "this subsection" in § 7412(d)(3) refers to subsection 7412(d) of the Clean Air Act, which follows Congress's ordinary "hierarchical scheme" for dividing statutes into sections and subsections. *United States v. Hines*, 694 F.3d 112, 118 (D.C. Cir. 2012) (describing hierarchical statutory subdivisions).

4

we are without authority to insert one."). Even if EPA's position were "sensible," "a reviewing court's 'task is to apply the text [of the statute], not to improve on it.'" *EPA v. EME Homer City Generation*, 134 S. Ct. 1584, 1600-01 (2014) (quoting *Pavelic & LeFlore v. Marvel Entertainment Grp.*, 490 U.S. 120, 126 (1989)).

Moreover, even if setting § 7412-compliant standards for carbon monoxide would not yield further reductions in organic hazardous air pollutants, that would not show that Congress could not have meant what § 7412(d)(3) says or that requiring compliance with § 7412(d)(3) leads to absurd results. *See New Jersey*, 517 F.3d at 582. If this Court finds that EPA's 130 ppm standards are unlawful, it will be up to EPA to decide how to fix or replace them. If, at that point, EPA believes that setting stronger carbon monoxide standards would be futile, the agency does not have to set carbon monoxide standards at all. This Court has already held that EPA acted unreasonably by using carbon monoxide as a surrogate for organic hazardous air pollutants, and EPA does not dispute that it could instead set direct standards for them or control them using other surrogates. *U.S. Sugar Corporation v. EPA*, 830 F.3d 579, 628-30 (D.C. Cir. 2016); Br. at 28. Nor does EPA dispute that setting such standards would yield reductions in emissions of

organic hazardous air pollutants beyond those that will result from controlling carbon monoxide emissions to 130 ppm.[2]

Finally, EPA does not claim its weakened standards reflect the emission levels achieved by the boilers that are best performing with regard to organic hazardous air pollutants. The record shows EPA initially based these standards on the best performing sources with respect to carbon monoxide and then, finding those standards "not appropriate," simply weakened them to 130 ppm. 78 Fed. Reg. 7138, 7145/2 (Jan. 31, 2013), JA0016; Br. at 13-14, 27. Although EPA sought to imply that there was some connection between its weakened standards and the best performers with respect to organic HAPs, Br. at 30, EPA disavows that notion in its brief. EPA Br. at 21.

### 3. *U.S. Sugar* Does Not Support EPA's Floors.

EPA (at 18-21) and intervenors (at 4-5) seek to rely on the recent decision in *U.S. Sugar*. There, this Court held that EPA's use of carbon monoxide as a surrogate for organic hazardous air pollutants was unreasonable. 830 F.3d at 628-30. Nothing in that decision even suggests that the weakened carbon monoxide standards at issue here either comply with § 7412(d)(3)'s floor requirements or are excused from these requirements.

---

[2] EPA's lawyers' attempt to dispute this point *post hoc* (at 20, 24-26) is addressed *infra* at 10-14.

Indeed, far from supporting EPA's position, *U.S. Sugar* confirms that EPA's weakened standards are both unlawful and unreasonable. It holds that, to be reasonable, a surrogate must "accomplish what the statute plainly requires: that the EPA set emission standards for organic HAPs at the average level achieved by the best performers *with regard to those HAPs*." *Id.* at 628. Under carbon monoxide were a reasonable surrogate for organic hazardous air pollutants <u>and</u> EPA set carbon monoxide standards at the levels required by § 7412(d)(3), <u>then</u> EPA's carbon monoxide standards would "accomplish what the statute plainly requires." *Id.* Here, however, carbon monoxide is not a reasonable surrogate, *id.* at 628-29, and EPA's carbon monoxide standards do not even purport to comply with § 7412(d)(3). In no sense do they "accomplish what the statute plainly requires." *Id.* at 628.

Moreover, *U.S. Sugar* underscores the irrelevance of EPA's argument that, as a practical matter, reducing carbon monoxide emissions below 130 ppm would not produce further reductions in emissions of organic hazardous air pollutants. As *U.S. Sugar* confirms, Congress did not intend that organic hazardous air pollutants be reduced only to the extent that is possible through controlling carbon monoxide. *Id.* at 628-29.

EPA's insistence that carbon monoxide is an appropriate surrogate "for combustion efficiency-based control of organic HAPs," EPA Br. at 18, underscores

the fundamental flaw in EPA's position. As this Court has held over and over, § 7412(d)(3) requires floors to reflect "the emission level actually *achieved* by the best performers (those with the lowest emissions)," not the level that EPA thinks is "achievable" through the use of any particular control measure. *Sierra Club*, 479 F.3d at 880-81 (citing *Cement Kiln Recycling Coalition*, 255 F.3d at 861). Boilers achieve reductions in organic HAP emissions not just through "combustion efficiency-based control," EPA Br. at 18, but through other control technologies and methods as well. *U.S. Sugar*, 830 F.3d at 629; 76 Fed. Reg. 15,608, 15,653/3-54/1 (Mar. 21, 2011), JA0010-11; 75 Fed. Reg. 32,006, 32,042/1 (June 4, 2010), JA0004; Br. at 11-13, 37-39. EPA's insistence that its 130 ppm carbon monoxide standards are good enough because they reflect the level of organic HAP emissions that EPA thinks is achievable through one control measure alone – "combustion efficiency-based control," EPA Br. at 18 – just shows that EPA continues to "disagree[] with the Clean Air Act's requirements for setting emissions standards" and "this court's interpretation of the Clean Air Act." *Sierra Club*, 479 F.3d at 884.

**4.     EPA's Lawyers' Argument That EPA's Weakened Floors Require The Maximum Achievable Reductions Is *Post Hoc* And Without Merit.**

Without providing any citation to the record, EPA's lawyers now claim that EPA's 130 ppm carbon monoxide standards "reflect[] the maximum achievable reduction in emission of HAPs." EPA Br. at 20. As explained in detail below, EPA

8

made no such claim. *See infra* at 10-14; *see also Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1138 (D.C. Cir. 2013) ("*NACWA*") ("EPA did not state this rationale in the rulemaking, and we cannot 'accept appellate counsel's *post hoc* rationalizations for agency action.'") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Insurance Co.*, 463 U.S. 29, 50 (1983)).

Even if it were properly before the Court, EPA's lawyers' notion that EPA can bypass the requirements of § 7412(d)(3) if it believes a standard requires the maximum achievable reductions must be rejected as contrary to the statute and Circuit precedent. Section 7412(d)(3) "limits the scope of the word 'achievable' in section 7412(d)(2)" and makes clear that, regardless of what EPA thinks "achievable," the agency's standards must be no less stringent than the emission level actually "achieved" by the relevant best performing sources. *Sierra Club*, 479 F.3d at 878 (quoting *Cement Kiln Recycling Coalition*, 255 F.3d at 861). Indeed, EPA has an affirmative obligation to demonstrate with substantial evidence that its standards satisfy § 7412(d)(3). *NACWA*, 734 F.3d at 1131. EPA cannot avoid either compliance with § 7412(d)(3) or its obligation to demonstrate compliance with this provision just by declaring that its standards satisfy § 7412(d)(2). *See United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (internal quotation marks and citation omitted).

**B.    EPA's Weakened Carbon Monoxide Standards Do Not Require The Maximum Achievable Reductions In Either Carbon Monoxide Or Organic Hazardous Air Pollutants.**

**1.    EPA Never Claimed That Its Standards Require The Maximum Achievable Reductions.**

In the rulemaking, EPA did not claim that the carbon monoxide standards it weakened to 130 ppm require the maximum degree of reduction that is achievable in either carbon monoxide or organic hazardous air pollutants. Br. at 36-37. EPA does not dispute this point, and its brief fails to identify any part of the record where EPA made any such claim. Because EPA's standards do not even purport to satisfy § 7412(d)(2)'s requirement for the "maximum" reductions that are "achievable," they are unlawful. 42 U.S.C. § 7412(d)(2); Br. at 36-39.[3] *See Lamie*, 540 U.S. at 534.

**2.    EPA's Lawyers' Claim That EPA's Weakened Carbon Monoxide Standards Require The Maximum Achievable Reductions In Organic HAPs Is *Post Hoc* And Without Merit.**

As noted above (at 8-9), EPA's lawyers claim that EPA's 130 ppm CO standards require the "maximum reduction of organic HAP emissions for the units at issue." EPA Br. at 20. That claim appears nowhere in the record, and is at odds

---

[3] EPA misrepresents petitioners' argument on this point as a belated challenge to EPA's use of carbon monoxide as a surrogate, which this Court addressed in *U.S. Sugar*. EPA Br. at 23-24. As petitioners' brief makes clear, the present case challenges EPA's 130 ppm carbon monoxide standards as too weak to satisfy § 7412(d)(2). Br. at 36-39.

with EPA's own statements. *See State Farm*, 463 U.S. at 50 (courts cannot "accept appellate counsel's *post hoc* rationalizations for agency action.").

EPA itself claims only that additional reductions in organic HAPs cannot be achieved by lowering carbon monoxide emissions below 130 ppm, not that such reductions cannot be achieved at all. 78 Fed. Reg. at 7145/1, JA0016; Br. at 36-37. Those two claims are very different because, as EPA admits, boilers can and do achieve reductions in at least one organic hazardous air pollutant, polycyclic organic matter ("POM"), through means that have nothing to do with lowering carbon monoxide emissions: "various post-combustion controls," including "fabric filter[s], "wet scrubber[s]," and "activated carbon injection." 76 Fed. Reg. at 15,653/3-54/1, JA0010-11; 75 Fed. Reg. at 32,042/1, JA0004. *See U.S. Sugar*, 830 F.3d at 628-29; Br. at 11-13, 37-39.

EPA's lawyers quibble that EPA did not "state that post-combustion controls will reduce emissions of POMs from units operating with carbon monoxide below 130." EPA Br. at 25 (emphasis added). In fact, EPA stated broadly and without any qualification that "POM is effectively reduced by the combustion and post-combustion practices required to comply with [Clean Air Act § 7412] standards." 76 Fed. Reg. at 15,653/3, JA0010; *see* Br. at 39. EPA never said that this is true only when CO levels are above 130 ppm, and EPA's lawyers provide no record

evidence to support such a claim. EPA's lawyers cannot rewrite the record to suit their litigation strategy. *State Farm*, 463 U.S. at 50.

EPA's lawyers also make repeated claims that all organic HAPs are "combust[ed]" at carbon monoxide levels below 130 ppm. EPA Br. at 21, 23 (citing 78 Fed. Reg. at 7144-45, JA0015-16; EPA-HQ-OAR-2002-0058-3846 ("2013 RTC") at 119, JA0231). As shown by the very portions of the record they cite, EPA itself said something very different. In the 2013 Final Rule, EPA "evaluated whether there is a minimum CO level … below which there is no further benefit in organic HAP reduction/destruction," and concluded that "lowering the CO floor below 100 ppm will not provide reductions in organic HAP emissions." 78 Fed. Reg. at 7144/3-45/2, JA0015-16. In the 2013 RTC, EPA said that at levels below 150 ppm, "CO is not a good surrogate for formaldehyde emissions/destruction because the overall CO-formaldehyde data show either no further reduction or an increase in formaldehyde emissions." 2013 RTC at 119, JA0231. EPA's conclusion that <u>reducing CO emissions below 130 ppm will not yield further reductions in organic HAP emissions</u> lends no support to its lawyers' inaccurate *post hoc* assertion that boilers <u>emit no organic HAPs when their CO emissions are below 130 ppm</u>. *See State Farm*, 463 U.S. at 50.

With respect to POM, EPA's lawyers assert that at carbon monoxide levels below 130 ppm, "any POMs introduced in the feed and organic precursors needed

to create POMs post-combustion have been destroyed." EPA Br. at 25. They cite to no part of the record where EPA ever: (1) claimed that POMs introduced in the feed are destroyed in the combustion process under any combustion conditions; (2) identified any of the precursors "needed to create POMs post-combustion"; or (3) claimed those precursors are "destroyed" in the combustion process at CO levels below 130 ppm. *See State Farm*, 463 U.S. at 50.

EPA's lawyers seek to rely on EPA's claim that there is a "strong relationship between carbon monoxide and PAH[4] emissions." EPA Br. at 26 (citing EPA-HQ-OAR-2002-0058-3937 ("2015 RTC") at III-1 to III-2, JA0365-66). The record shows that carbon monoxide and PAH vary proportionally in some conditions and "inverse[ly]" in others. EPA-HQ-OAR-2002-0058-3856 ("CO and PAH Study") at 3777, JA0130; Br. at 37-38. Unlike its lawyers (at 25), however, EPA never claimed that POM or POM precursors are "destroyed" in the combustion process at carbon monoxide levels below 130 ppm. *See State Farm*, 463 U.S. at 50; *Florida Power & Light Co. v. FERC*, 85 F.3d 684, 689 (D.C. Cir. 1996) ("the agency runs this regulatory program, not its lawyers; parties are entitled to the agency's analysis of its proposal, not post hoc salvage operations of counsel").

---

[4] POM is composed of 16 polycyclic aromatic hydrocarbons ("PAH"s). Br. at 4 n.2.

13

Indeed, EPA's own data show that POM is not destroyed in the combustion process at these (or any other) carbon monoxide levels. EPA-HQ-OAR-2002-0058-0006 at 8-36 tbl.8-12, JA0116 (showing that when CO levels are between 0 and 200 ppm, average "carcinogenic PAHs" emissions are 361.8 nanograms/dry standard cubic meter ("ng/dscm") and average "total PAHs" are 157.59 micrograms/dry standard cubic meter ("μg/dscm"). EPA's lawyers offer nothing to show or even suggest that reductions in these obviously real and non-zero POM emissions cannot be achieved by means other than combustion control – as EPA itself has determined they can. 76 Fed. Reg. at 15,653/3-54/1, JA0010-11.

## II.    EPA'S WORK PRACTICE STANDARDS FOR STARTUP AND SHUTDOWN ARE UNLAWFUL AND ARBITRARY.

### A.    EPA Did Not Satisfy § 7412(h)'s Requirements For Setting Work Practice Standards In Lieu Of Numeric Emission Standards.

#### 1.    By Setting Work Practice Standards Without Determining That Emissions Measurement Is Impracticable For Any Particular Class Of Sources, EPA Violated The Clean Air Act.

EPA does not dispute that, to set work practice standards, the agency must first determine that it is infeasible to set numeric emission standards because measurement of emissions is impracticable for a particular class of sources. Br. at 47-49; EPA Br. at 37-38. Nor does EPA dispute that delegating this determination to individual boiler operators is unlawful. Instead, EPA argues it "determined that numeric standards are impracticable during startup, and that startup can last for as

14

long as four hours after a boiler begins to provide useful thermal energy." EPA Br. at 37-38.

EPA's generic statement that numeric standards are impracticable "during startup" cannot suffice here, where EPA has promulgated two very different definitions of "startup." Under one definition, "startup" does not end until "four hours after when the boiler … supplies useful thermal energy." 80 Fed. Reg. 72,790, 72,818/3 (Nov. 20, 2015), JA0092.[5] Under the other, "[s]tartup ends when any of the useful thermal energy from the boiler … is supplied for heating and/or producing electricity." *Id.* By promulgating the shorter startup definition, EPA necessarily concedes that it is practicable for some boilers to measure their emissions during the four hours after useful energy is supplied. Indeed, EPA expressly "recognize[s] that some facilities can engage all controls and comply with numeric emission standards by the time the boiler begins to provide useful thermal energy." EPA Br. at 38.

Because <u>some boilers</u> undisputedly can measure their emissions during the four hours following the supply of useful thermal energy, EPA does not (and cannot) argue that measurement of emissions during this time period is

---

[5] When "startup ends," boilers must start to meet numeric emission standards. *Id.* at 72,819-23 tbls.1 & 2, JA0093-97 (providing "emissions must not exceed the following [numeric] emission limits, <u>except</u> during startup and shutdown") (emphasis added).

15

impracticable for <u>all boilers</u>. Instead, as EPA's brief confirms, all EPA offers is the vague claim that measuring emissions is impracticable for <u>some undefined subset of the boilers category</u>. That claim falls far short of the undisputed statutory prerequisite for work practice standards: "determin[ing]" that "application of measurement methodology <u>to a particular class of sources</u> is not practicable" and that it is, therefore, "not feasible … to prescribe or enforce an emission standard." 42 U.S.C. § 7412(h)(1)-(2) (emphasis added).

Equally unavailing is EPA's claim that startup "can last" up to four hours after boilers start providing useful thermal energy. EPA Br. at 37-38. That is not a determination that startup actually does last so long for any "particular class" of boilers, 42 U.S.C. § 7412(h)(2), and EPA concedes that it provided a definition of startup that "ends when any of the useful thermal energy from the boiler … is supplied," 80 Fed. Reg. at 72,818/3, JA0092, precisely because "some facilities can engage all controls and comply with numeric emission standards by the time the boiler begins to provide useful thermal energy." EPA Br. at 38.

EPA argues that it lacked information that "would allow it to define a shorter startup period for any subcategory of units" and "thus <u>could have</u> simply defined startup as ending four hours after a unit begins to supply thermal energy" – *i.e.*, exempted <u>all</u> boilers from compliance with numeric standards during these four

hours. *Id.* (emphasis added). That merely confirms that EPA did not give startup this definition.

Moreover, contrary to EPA's suggestion (at 38), the statutory requirement that EPA "determine[] that … the application of measurement methodology to a particular class of sources is not practicable," 42 U.S.C. § 7412(h)(2), is not waived when EPA lacks the information it needs to make this determination. Rather, if EPA cannot make the determination that the statute requires, EPA lacks statutory authority to set work practice standards. *North Carolina v. EPA*, 531 F.3d 896, 922 (D.C. Cir. 2008) ("Lest EPA forget, it is 'a creature of statute,' and has 'only those authorities conferred upon it by Congress'; 'if there is no statute conferring authority, a federal agency has none.'") (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)).

It bears emphasis that EPA's violation of § 7412(h) has serious statutory and practical consequences. Neither this Court nor the public can possibly evaluate the merits of a claim that numeric emission standards are "not feasible" where, as here, nothing in the record shows which "particular class of sources," if any, is actually unable to measure emissions or why they cannot do so. The requirement that EPA determine that measurement of emissions is not practicable "for a particular class of sources" is a "textually applicable provision[] meant to limit [EPA's] discretion" to set work practice standards. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457,

17

484-85 (2001). If EPA can dispense with the specific determination that § 7412(h)(2) requires just because it lacks information needed to make that determination, the agency is free to set work practice standards when it does not know whether a particular class of sources can measure emissions. Indeed, EPA is free to set work practice standards even for sources that can measure emissions – as the agency has done here for the boilers that undisputedly can measure emissions as soon as they start supplying useful energy. This outcome not only contravenes § 7412(h)(1) and (2), but defeats the purpose of the express limitations that these provisions place on EPA's authority and frustrates § 7412(h)(4)'s requirement for numeric emission standards "whenever it is feasible to promulgate and enforce them." It also deprives the public of the stronger protection that numeric emission standards provide.

## 2. EPA's Decision To Set Work Practice Standards For The Extended Startup Period Is Arbitrary And Capricious.

EPA's decision to set work practice standards governing the four hours after boilers begin supplying useful energy is also arbitrary. Br. at 49-51. EPA offers virtually no defense of this decision except to say that it lacked information and that its decisions about how much information to gather are entitled to deference. EPA Br. at 39-40. Whatever deference might be due to EPA's information

gathering choices, the decisions EPA makes must still be logical, rational, and supported by the record evidence. That is not the situation here.

First, EPA simply assumed that because some power plants and boilers <u>choose</u> not to engage their controls for four hours after thermal energy is supplied, boilers' operations are necessarily unstable during that time period. Br. at 49-51. Nowhere in the record did EPA explain or support this non-sequitur assumption. *Id.* at 50-51. Further, EPA ignored an explanation for facilities' choice not to engage controls that has nothing to do with the stability of their operations: delaying the engagement of controls saves money. *Id.* at 49. EPA's brief offers no defense or explanation for EPA's assumption, and identifies no part of the record where the agency even considered this issue in a rational manner. *See State Farm*, 463 U.S. at 43 (agency must "articulate … a 'rational connection between the facts found and the choice made'").[6]

Second, EPA explains its decision to set work practice standards for the four hours after boilers start to supply useful energy by questioning whether any boilers can measure emissions in this time period. Br. at 50; 2015 RTC at II-5, JA0353.

---

[6] Intervenors argue that other sources, electric generating units, engage controls as early as possible because they are subject to caps on emissions of non-hazardous air pollutants under other Clean Air Act programs. Int. Br. at 27. Because EPA did not offer this rationale, it cannot support the agency's decision. *SEC v. Chenery*, 318 U.S. 80, 87 (1943); *Southern Cal. Edison Co. v. FERC*, 603 F.3d 996, 1001 (D.C. Cir. 2010) (rejecting intervenors' *post hoc* rationale).

Yet EPA also concedes some boilers can and do "comply with numeric emission standards by the time [they] begin[] to provide useful thermal energy." EPA Br. at 38; 2015 RTC at II-4, JA0352. Likewise, EPA claims that both of its startup definitions – one ending when useful energy is supplied and one ending four hours later – "reflect when steady-state conditions are achieved." Br. at 51 (quoting 80 Fed. Reg. at 72,793/1, JA0067). Nowhere does EPA reconcile this conflict. Moreover, because EPA concedes that <u>some</u> boilers can meet numeric emission standards during the longer startup period, its decision to exempt <u>all</u> boilers from compliance with numeric emission standards during this time period is "divorced from the statutory text," which makes plain that work practice standards are permissible only for a "particular class of sources" that cannot measure emissions. *Massachusetts v. EPA*, 549 U.S. 497, 501 (2007).

## B.    EPA's Work Practice Standard For The Extended Startup Period Is Inconsistent With § 7412(d) And Arbitrary.

### 1.    EPA's Work Practice Standard Is Not "Consistent With" § 7412(d).

EPA does not dispute that, to be "consistent with" § 7412(d), work practice standards must require the "maximum" degree of reduction in emissions that is "achievable." 42 U.S.C. § 7412(d)(2), (h)(1); Br. at 10, 41-43. Although EPA insists its work practice standard comports with § 7412(d), the agency's brief confirms that, for pollutants other than particulate matter, boilers need only comply

20

with one requirement during the four hours after they start supplying useful energy: to engage pollution controls "as expeditiously as possible." EPA Br. at 29-33.

The whole point of a limit on the time allowed before engaging controls is that the sooner sources engage their controls, the less they emit. Thus, telling each source to engage controls "as expeditiously as possible" is no different than telling each source to "reduce emissions as much as possible." As this Court has already held, a standard that merely requires individual sources to "minimize emissions to the greatest extent possible" is not "a section [7412]-compliant standard." *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008).

EPA argues (at 30-31) that *Sierra Club*'s holding is inapplicable because here, unlike in that case, EPA set work practice standards rather than exempting sources from compliance altogether. That argument misses the point. Although *Sierra Club* does not preclude EPA from setting work practice standards, it makes plain that any standard that merely directs sources to "minimize emissions to the greatest extent possible" is not "a section [7412]-compliant standard." 551 F.3d at 1027. Nowhere does EPA explain how a standard that is not "section [7412]-compliant" is nonetheless "consistent with" § 7412(d)(2). Indeed, EPA agrees that "[g]eneral duty requirements" such as the one addressed in *Sierra Club* "do not

21

constitute appropriate work practice standards under section [7412](h)." 76 Fed.

Reg. 80,598, 80,615/3 (Dec. 23, 2011), JA0013.

Even if *Sierra Club* had not been decided, a standard that allows each source

to engage controls as quickly as possible for that source does not "require" the

reduction in emissions that EPA has "determine[d]" is the maximum achievable for

sources in the category. 42 U.S.C. § 7412(d)(2); Br. at 42-43. Nor is allowing each

boiler to do whatever is currently possible for it consistent with Congress's

purpose, which was to drive improvement in pollution control. Br. 43-44.

Rather than offering a defense or explanation for its reading of the statute,

EPA argues that petitioners "place too much emphasis on certain snippets of the

statute without examining the larger context." EPA Br. at 33 (quoting *U.S. Sugar*,

830 F.3d at 663). Petitioners do not rely on any mere "snippet," nor do they

suggest EPA should ignore cost, *cf. U.S. Sugar*, 830 F.3d at 663. Rather, they point

out that, under § 7412(h)(1) and (d)(2), work practice standards must require the

emissions reduction that EPA determines is the maximum achievable, considering

cost and the other statutory factors, through the reduction measures enumerated in

§ 7412(d)(2)(A)-(E). Br. at 42-44. EPA neither disputes that this is what the statute

mandates, nor points to any part of the record where it even claimed that the "as

expeditiously as possible" requirement comports with this mandate.

Seeking to deflect attention from the inadequacy of its "as expeditiously as possible" requirement, EPA claims (at 31-32) that it is just "one part" of the work practice standard that applies during the four hours after boilers supply useful energy. In particular, EPA claims boilers must "utilize clean fuels when not engaging pollution control equipment." EPA Br. at 31-32. As the regulation makes clear, however, boilers are free to burn fuels "that are not clean" throughout the four-hour startup period, regardless of whether controls (other than for particulate matter) are engaged. Br. at 19 (quoting 80 Fed. Reg. at 72,824 tbl.3, pt.5.c.2, JA0098). The other requirements EPA relies on (apart from the requirement to engage particulate matter controls) are ancillary monitoring and data handling requirements that are neither emission nor work practice standards and do not reduce emissions.

In the same vein, EPA claims (at 31) its work practice requirement is "enforceable." A work practice is not "consistent with" § 7412(d) just because it is enforceable. In any event, EPA does not suggest how anyone could show in an enforcement action that a source did not meet this requirement, or even obtain the information EPA concedes would be necessary to make this showing. EPA Br. at 33 (whether it is possible to engage controls depends on "temperature, pressure and other operating conditions" of each individual boiler).

23

EPA argues (at 35) that its work practice standard is "an achievable standard based on the practices utilized by the best performing sources." Although it goes without saying that a standard that merely requires each boiler to do what is possible for it is "achievable," the obvious achievability of this work practice standard does nothing to show that it requires the "maximum" degree of reduction that EPA has determined to be achievable. 42 U.S.C. § 7412(d)(2).

Nor does it help EPA to claim that its work practice standard is allegedly "based on the practices utilized by the best performing sources." That claim might be intended to show consistency with § 7412(d)(3)'s requirement that standards reflect what is "achieved" by the "best performing sources," but it does nothing to show that EPA's work practice standard satisfies § 7412(d)(2)'s requirement for the "maximum" degree of reduction that EPA has determined to be "achievable." It is undisputed that to be "consistent with the provisions of" § 7412(d), a work practice must satisfy both § 7412(d)(2) and (d)(3). Br. at 10, 41.

Finally, EPA's lawyers assert without citation that the agency's work practice "minimizes emissions" and that "EPA appropriately considered the cost of the standard and other health and energy factors." EPA Br. at 35. They identify no part of the record where these claims appear. *See State Farm*, 463 U.S. at 50. EPA itself never considered what degree of reduction is achievable or provided any

24

explanation for rejecting stronger work practice requirements (*e.g.*, the use of clean fuels) as unachievable.

> **2.      EPA's Desire To Accommodate "Each Possible Combination" Of Boiler, Fuel, And Control Equipment Does Not Excuse The Unlawfulness Of Its Work Practice Standard.**

EPA argues that boilers must be "brought up to temperature in a controlled fashion," and that control equipment requires specific operating temperatures and other conditions to operate properly. EPA Br. at 26-29, 34. EPA then claims that, given the broad range of equipment at issue, it had no basis on which to determine the shortest time in which controls can be engaged for "each possible combination" of boiler, fuel, and control equipment. *Id.* at 34. Therefore, EPA asserts, it "reasonably established a standard of as 'expeditiously as possible.'" *Id.* at 34-35.

Section 7412(d)(2) requires the "maximum" degree of reduction that is achievable "through application of" the measures enumerated in § 7412(d)(2)(A)-(E), not the degree of reduction that is achievable by every individual source in the category using its <u>current</u> combination of operating equipment, fuel, and control equipment. Although some boilers undisputedly can engage controls as soon as they supply useful energy, EPA did not even consider whether other boilers could do the same by, for example, installing different equipment or burning different fuels. *A fortiori*, EPA did not determine whether such reductions are achievable considering cost and the other statutory factors.

25

By rejecting work practice requirements unless they accommodate "each possible combination" of boiler, fuel, and control equipment, EPA seeks to rewrite the requirements of § 7412(d)(2), with which EPA's work practice standards must undisputedly be "consistent." *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2445 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."). Further, EPA fails to provide any explanation for rewriting the statute in this fashion. *See Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011) (court defers to agency interpretation "only if the agency has offered a reasoned explanation for why it chose that interpretation"); *State Farm*, 463 U.S. at 43 (agency must provide "rational connection between the facts found and the choice made").

### 3. EPA's Refusal To Require Boilers To Use Clean Fuels During Startup Is Unlawful And Arbitrary.

EPA claims that petitioners identified no measure that would reduce emissions beyond engaging controls as expeditiously as possible. EPA Br. at 35. To the contrary, petitioners explained that, by considering only its "as expeditious as possible" standard and refusing to "determine[]" the maximum degree of reduction that is "achievable" during the extended startup period, EPA failed to assess the additional reductions that could be achieved through using clean fuels.

26

Br. at 44. *See also* EPA-HQ-OAR-2002-0058-3511 ("2011 Earthjustice Comments") at 17-18, JA0192-93.

EPA is well aware that using clean fuels during startup would reduce emissions more than just engaging controls as expeditiously as possible. EPA itself insists in the preamble that its "work practices include use of clean fuels." 80 Fed. Reg. at 72,793/3, JA0067. Moreover, EPA found in the record that "there is no technical barrier to burning clean fuels (e.g., natural gas, distillate oil) for longer portions of startup or shutdown periods at a boiler and the HAP emission reduction benefits warrant additional utilization of such fuels until the temperature and stack emissions pressure is sufficient to engage the [air pollution control device]." 78 Fed. Reg. at 7147/1, JA0018.

Nonetheless, the regulatory text makes clear that boilers are free to burn fuels "that are not clean" throughout the four-hour startup period, whether they have engaged pollution controls or not. Br. at 19 (quoting 80 Fed. Reg. at 72,824 tbl.3, pt.5.c.2, JA0098), 44. EPA's failure to require the use of clean fuels confirms that: (1) EPA's work practice does not require the "maximum" reductions that are "achievable" and is not "consistent with" § 7412(d); and (2) EPA never "determine[d]" what the maximum achievable degree of reduction is. *See* Br. at 44. Further, by falsely claiming that its rule requires the use of clean fuels – rather than

27

explaining why it does not – EPA acted arbitrarily. *See State Farm*, 463 U.S. at 43;

*Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998).

## C.     EPA's Work Practice Standard For Shutdown Is Unlawful And Arbitrary.

### 1.     EPA's Misrepresentation Of Its Rule Is Arbitrary.

EPA does not deny that, although it claimed in the preamble to have

"adopt[ed] work practices that apply during the period of startup and shutdown"

and "include use of clean fuels," its work practices actually allow the use of fuels

"that are not clean" during shutdown. *Compare* 80 Fed. Reg. at 72,793/3, JA0067,

*with id.* at 72,824 tbl.3, pts.5.c.1-2, pt.6, JA0098. *See* Br. at 18-19.[7] EPA's

undisputed misrepresentation of its own rule is arbitrary. Br. at 45-46; *Allentown*

*Mack*, 522 U.S. at 374.

### 2.     EPA's Work Practice Standard For Shutdown Is Inconsistent With § 7412(d) And Arbitrary.

EPA seeks to distract attention from its failure to set either emission

standards or work practice standards that apply during shutdown by claiming that it

---

[7] Contrary to Intervenors' claim (at 30), commenters objected to EPA's failure to require the use of clean fuels during startup and shutdown. 2011 Earthjustice Comments at 17-18, JA0192-93. In any event, EPA has waived the issue by not raising it, and "[i]ntervenors may only argue issues that have been raised by the principal parties." *Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 675 (D.C. Cir. 2013).

established monitoring requirements. EPA Br. at 35. Those requirements are not

work practice requirements, do not purport to limit emissions in any way, and,

therefore, do not satisfy the agency's statutory obligation to set work practice

standards that are consistent with § 7412(d).

In the same vein, EPA claims to have required that "pollution control

equipment <u>other than</u> limestone injection, dry scrubbers, fabric filters, selective

non-catalytic reduction, and selective catalytic reduction be engaged if non-clean

fuels are being combusted." *Id.* (emphasis added). EPA does not identify the

"other" pollution control equipment it refers to, but its rule merely provides that

boilers that have already installed those "other" types of equipment must use them.

80 Fed. Reg. at 72,824 tbl.3, pt.6, JA0098. The remaining boilers do not have to

install any new equipment or even use the equipment they have. For these boilers,

EPA's rule does not establish any control requirements during shutdown, and the

agency's purported work practice standard is actually just an exemption from

emission standards. *See* Br. at 46-47; *Sierra Club*, 551 F.3d at 1027 (holding such

exemptions unlawful). For the category as a whole, the requirement that some

boilers continue to use their control equipment during shutdown does not purport

to require the "maximum" degree of reduction that is "achievable."

EPA next argues that <u>if</u> boilers use a fuel during shutdown that is different

than the fuel they use during operation, that alternative fuel must be clean. EPA Br.

29

at 35-36. That claim merely confirms that if boilers are using any dirty fuel during normal operations, they are free to continue using that same dirty fuel during shutdown.

Without providing any record citations, EPA's lawyers suggest that, having considered costs and the other statutory factors, the agency determined doing nothing was the most that boilers can do to reduce emissions during shutdown. *Id.* at 36. Far from making any such claim, EPA itself asserted – albeit falsely – that it was requiring the use of clean fuels during shutdown. 80 Fed. Reg. at 72,793/3, 72,824 tbl.3, pt.6, JA0067, 0098; Br. at 45-46. EPA's lawyers' new and conflicting explanation for EPA's decision must be rejected as an impermissible *post hoc* rationale. *See State Farm*, 463 U.S. at 50.

## CONCLUSION

Petitioners respectfully request that the challenged rule be remanded without vacatur so that EPA can issue a revised rule free of the defects identified in their opening brief and above. Petitioners also request vacatur of the second definition of "startup" in 40 C.F.R. § 63.7575, under which "[s]tartup ends four hours after when the boiler or process heater supplies useful thermal energy … or generates electricity, whichever is earlier."

DATED:    February 6, 2017        Respectfully submitted,

<u>/s/ James S. Pew</u>
James S. Pew                Patton Dycus
Neil Gormley                Eric Schaeffer
Earthjustice                Environmental Integrity Project
1625 Massachusetts Ave., N.W.        1000 Vermont Ave., N.W.
Suite 702                Suite 1100
Washington, D.C. 20036-2212        Washington, D.C. 20005
(202) 667-4500                (202) 296-8800
jpew@earthjustice.org            pdycus@environmentalintegrity.org
ngormley@earthjustice.org        eschaeffer@environmentalintegrity.org

*Counsel for Louisiana Environmental*        *Counsel for Environmental Integrity*
*Action Network, Sierra Club, Clean Air*      *Project and Chesapeake Climate*
*Council, Partnership for Policy*            *Action Network*
*Integrity, and Environmental Integrity*
*Project*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Counsel hereby certifies, in accordance with Federal Rule of Appellate Procedure 32(g)(1), that the foregoing **Final Reply Brief of Petitioners** contains 6,955 words, as counted by counsel's word processing system, and thus complies with the 7,000 word limit established by this Court's Order of March 24, 2016.

Further, this document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) & (a)(6) because this document has been prepared in a proportionally spaced typeface using **Microsoft Word 2010** using **size 14 Times New Roman** font.

DATED: February 6, 2017

/s/ James S. Pew
James S. Pew

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of February, 2017, I have served the

foregoing **Final Reply Brief of Petitioners** on all registered counsel through the

Court's electronic filing system (ECF).


/s/ James S. Pew
James S. Pew